**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LATONDRA INGRAM, Individually, and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 11-cv-6566 |
| v | ) ) | |
| WORLD SECURITY BUREAU, INC. and DENA HALLOWAY, | ) ) ) | (JURY TRIAL DEMANDED) |
| Defendants. | ) ) ) | |

**MOTION TO DECERTIFY CONDITIONAL CLASS DESIGNATION**

Now Comes the Defendants, World Security Bureau, Inc. ("WSB") and Dena Halloway,

by and through their attorneys, Anthony S. Graefe and Mark Hansen, of Graefe & Hansen, Ltd.,

and for their Motion to Decertify the Conditional Class Designation, state as follows:

**Statement of the Case**

1.    On September 20, 2011, Plaintiff filed a Complaint under Section 216(b) of the Fair

Labor Standards Act ("FLSA") alleging that Defendants violated the wage and hour

provisions under the FLSA with regard to her and others similarly situated. In particular,

Plaintiff claims that she and others similarly situated were not paid for all wages for work

performed a) before their shift, b) after their shift, c) attending mandatory meetings, d)

maintaining their uniform, and e) as a result of the Company's 30-minute unpaid meal

period policy.

2.    A class was conditionally designated for purposes of sending a Notice pursuant to the

1

FLSA on November 15, 2011. [Dkt. No. 19]. Plaintiff's counsel was provided a list of over 700 former or current employees of WSB, and from the list provided, notices were sent. Approximately 200 former or current employees have opted-in.

3.  Defendants propounded written discovery on or about December 30, 2011, directed to the Plaintiff and 26 others who had filed opt-in notices at the time Plaintiff filed her Complaint. From that group, nine depositions were taken, namely, Kevin Brown, Lenard Horne, Larry Sextion, Fenton Flowers, Lonney Turner, George Macklin, Alicia King-Booker, Ed Reed, and Latondra Ingram.[1]

### Statement of Facts

4.  WSB is a licensed security guard company that provides security guard services of residential facilities operated by the Chicago Housing Authority, as well as other retail facilities. Throughout the period WSB has been in operation, it has provided security at many different facilities, numbering between 35 and 40 separate locations at any particular point of time. Currently, WSB provides guards for approximately 37 separate locations. Exhibit A, Affidavit of Ibrihim Kiswani, ¶ 1.

5.  The locations WSB contract to guard can be for a very short term period from a few days to weeks, to periods extending for years. Exhibit A, ¶ 1.

6.  Ibriham Kiswani, often known to the guards as "Abe" or Abraham" ("I Kiswani"), is the Operations Manager for WSB and has held that role since he began with WSB. In that position, he manages the day-to-day operations, which entail working in the office and

---

[1]Defendants had also sought to depose Christian Gayles, Marjorie Fabiyi, and DeWayne Bryant, but they failed to appear, which ultimately led to them being dismissed from the case. [Dkt. No. 87].

routinely visiting the work sites. Exhibit A, ¶ 2.

7.    Mike Kiswani ("M Kiswani") began with WSB in September 2009, performing

consultation services for the Company. For example, M Kiswani is involved in

investigating employee complaints of harassment or discrimination in the workplace, and

providing advice to Field Supervisors in addressing personnel issues. Exhibit A, ¶ 3.

8.    Below the Operations Manager, WSB employs Field Supervisors who are assigned to

oversee the daily operations of the various work sites WSB secures. Field Supervisors,

such as Israel Ortiz and Serfin Herrera (often known to the Guards as "Serf"), have the

authority to suspend, discharge, hire, demote, and issue other discipline directly effecting

the terms and conditions of an employee's employment, although they regularly seek

approval for such discipline. Other persons holding the position of Field Supervisor

during the period at issue are John Henley, Danny Dominguez, and Ziad. Exhibit A, ¶ 4.

9.    WSB also employs Site and Shift Supervisors. Shift Supervisors supervise guards

working on a particular shift while Site Supervisors oversee the guards assigned to a

particular site. Whether WSB maintains Shift and/or Site Supervisors at a site will often

depend upon the size of the staff at the site. Shift and Site Supervisors have no authority

to hire, discharge, suspend, demote, promote, reduce or increase a guard's pay, or set

guard work schedules. The extent of their authority involves directing guard activities

during the course of a shift and issuing Employee Warning Reports to guards for minor

performance violations, such as attendance, and such other offenses as may be directed by

Field Supervisors. Exhibit A, ¶ 5.

10.   In or around January 25, 2010, WSB changed its meal period policy. Prior to the

modification, WSB paid for guards who stayed on-site while taking their meal. Under the modification, employees were required to take a 30-minute meal period, which could be taken on or off site. However, even after the change in the meal period policy, WSB continued to follow its previous policy of paying for guards who stayed on-site while taking their meal for some sites, such as senior citizen buildings WSB has been contracted to guard. Exhibit A, ¶ 6.

11. Payroll is issued to guards every two weeks. During all relevant times, WSB maintained a DAT ("Digital Auto Tap") system that recorded the guards voice messages of their call-in and call-out times. Exhibit A, ¶ 7.

12. At the beginning of their employment, guards are regularly instructed to use the telephone located at the site to call into the DAT system to report the time they go on duty and the times they go off duty. All DAT recordings are stored electronically and maintained in the normal course of business. Exhibit A, ¶ 7.

13. WSB regularly records the guards' call-in and call-outs from the DAT system on time sheets, and those time sheets are the primary document WSB uses to calculate payroll. Such time sheets are retained as a business record and kept in the ordinary course of business. Exhibit A, ¶ 8. Guards failing to report for duty by their scheduled worktime are subject to disciplinary warnings, as is demonstrated by the written warnings for tardiness to all but two of the guards who were deposed. See Exhibit B.

14. During all relevant times, WSB provided a form to the guards for purposes of tracking their time. The decision to use the document was the guards alone. The document stated: "This time sheet is for reference/personal use only. WSA payroll department will use it as

4

a reference if your hours are short." The time sheet so provided is not part of the

Company's records that it regularly used to administer and calculate payroll. Exhibit A, ¶

9.

15. WSB maintains a process by which an employee can protest pay received. The process

consisted of guards completing a form noting the discrepancy they claimed and

submitting it to WSB. With the claim, the Company staff would review the DAT

recordings and time records to determine whether the claim had merit. As part of the

process, WSB staff would invite the guard to listen to his/her voice recordings for the

periods at issue. If a discrepancy is found, payment to the guard would usually follow in

the next paycheck. Exhibit A, ¶ 10.

**Deposition Testimony of Opt-ins**

**Kevin Brown**

16. Kevin Brown was hired as a guard for WSB on or about 3/28/08, and his employment

ended June 1, 2012. Exh. C, Brown Tr. 6-8, 25. Initially, WSB had a cleaning service the

guards used to launder their uniforms, but due to delivery problems resulting in uniforms

not being cleaned in a timely manner, WSB stopped that practice. Exh. C, Brown Tr. 19-

20. After use of the laundry service stopped, Brown washed his uniform himself by

turning it inside out and putting it in a washing machine and then a dryer. He washed his

uniform (consisting of a polo shirt and polyester blend pants) once a week separately

from his other clothes. Ibrihim Kiswani told Brown not to let his uniform fade and

suggested to turn the uniform inside out before putting it in the washing machine. Exh. C,

Brown Tr. 14-19.

5

17. During his employment, Brown was assigned various locations including Loomis Courts, Hamlin, Cabrini Greens, Dearborn Homes, 39th and Park, 41st and King Drive, and Ickes. Exh. C, Brown Tr. 23-24, 27. The last place he was assigned before his employment ended was 35th & Giles. Exh. C, Brown Tr. 25-26.

18. When Brown reported to the site, he was regularly not in uniform, and would change into his uniform on-site, which he said would take him about five minutes. Exh. C, Brown Tr. 42-45. Brown said he was told to report 30 minutes before his shift so he could have time to change his clothes and perform a pass-down before his shift started. Exh. C, Brown Tr. 30-36, 41-44. The pass-down took 10-15 minutes to perform. Exh. C, Brown Tr. 35-36.

19. To report the time he worked, Brown called into the system WSB used and reported the times he was on and off duty. Once he had changed into his uniform, he called into the system to report he was on duty. He would call off duty when he was relieved. Exh. C, Brown Tr. 28, 44-45, 99.

20. Before January 2010, WSB's policy was to pay for meal periods taken. After that, WSB changed its policy by which it provided guards a 30-minute unpaid meal period, which they were required to take. Exh. C, Brown Tr. 54-55. Even after the policy changed, some locations followed the previous policy, while others followed the revised policy. Exh. C, Brown Tr. 55-56. For example, when assigned the 41st & King and Howard sites, meal breaks were paid. Exh. C, Brown Tr. 57-59.

21. When working the Dearborn site, meal periods were not paid. There, roving guards relieved guards so that they could take their breaks, and break logs were used to list meal break time guards received. Exh. C, Brown Tr. 59-60, 71-75. Brown said he did not take

6

meal breaks while at Dearborn two-thirds of the time. Exh. C, Brown Tr. 60. Brown said he was not given a break due to manpower shortage, but also said that when a roving guard came to relieve him for his break, he would refuse to take it. Exh. C, Brown Tr. 61, 73-75. He also said that when he was a rover at the Dearborn homes, he would take his meal break after he had relieved the other guards for theirs. Exh. C, Brown Tr. 64

22. On one occasion, Brown was directed by Mike Kiswani to take his break or be terminated. While he then took his break, he continued to refuse to do so afterwards. Exh. C, Brown Tr. 61-62, 75. Brown never reported in writing that he was not being allowed to take his break, but did complain in writing of being forced to take a break he did not want to take. Exh. C, Brown Tr. 63, 76. Further, he was told by Serf that he was to take a break, whether he actually ate a meal or not. Exh. C, Brown Tr. 85-86. Brown signed or initialized his name on the break logs used to track meal breaks, noting he took a meal break, even though he did not always take it. Exh. C, Brown Tr. 77-94.

23. At other locations he was assigned, such at Cabrini Greens, Lake Park and Ickes, Brown worked with other guards on a shift, and in those situations, the guards could work out among themselves when each would take his or her break. Exh. C, Brown Tr. 65-68. If Brown did not take a meal break during his shift, he would not inform WSB of it. Exh. C, Brown Tr. 70. While working the Giles location, he worked along with a partner, and he and his partner would take their meal breaks together, although that did not occur all the time. Exh. C, Brown Tr. 112-113.[2]

---

[2] Brown's own log for the time he worked at the Giles site shows he listed working 7.5 hours, and not 8 hours (the hours he would have worked if he had taken no break). Yet, he insists he did not get a break, despite his own log to the contrary. Exh. C, Brown Tr. 117.

24.     Brown employed the process the Company had to report hours he claimed to be owed. He pursued this process about five times, and on two of those occasions, he considered the matter satisfactory resolved. Exh. C, Brown Tr. 96-98. Brown never employed this process to claim he was owed pay for breaks he said he did not get. Exh. C, Brown Tr. 110-116.

25.     Brown attended one meeting in 2012 and two in 2011 at the Dearborn site. Those meetings lasted from two to three hours. Meetings occurred once every nine to twelve months. He also attended a meeting at Cabrini and one at another site. There may have been a sixth meeting Brown attended, but he could not recall it. Exh. C, Brown Tr. 100-109.

26.     Brown claims that he is owed for meal breaks not taken and meetings he attended. Exh. C, Brown Tr. 110.

**Lenard Horne**

27.     Horne was hired as a security guard on or about March 14, 2011, and was terminated on or about May 28, 2011 due to a physical altercation with his supervisor. Exh. D, Horne Tr. 7, 20-25, 32.

28.     He was assigned to the Dearborn Homes when he first started and worked at that site throughout his employment. Exh. D, Horne Tr. 35-36. Horne worked the 4 p.m. to midnight shift during the first few weeks of his employment, but later changed to the third shift, starting at midnight, to accommodate child care issues. Exh. D, Horne Tr. 35-36.

29.     On some occasions, Horne was assigned to guard one of the buildings at the site. On

others, he worked as a rover. As a rover, Horne walked the grounds covering 3-5 of the buildings on the site, and relieved guards assigned in the building so they could take their 30-minute meal period. Exh. D, Horne Tr. 36, 38, 47-48, 65-67.

30.     Horne was aware the Company used break logs to track the break times guards received during the shift, although he did not complete them himself. Exh. D, Horne Tr. 64. Horne said he was not given a meal period 35-40% of the time, but he has no recollection of any time he was denied a break and the reason for it. Horne said that supervisors simply forgot to relieve him for breaks. Exh. D, Horne Tr. 68-71.

31.     The uniform Horne wore while employed with WSB consisted of rayon pants and a mesh-type polo shirt that he had dry cleaned once a week. Occasionally, Horne hand-washed his uniform. During his interview for the job, Horne said that Mike Kiswani told him to take his uniform to the cleaners. No one told him to hand-wash it, and he never washed his uniform using a washing machine. Exh. D, Horne Tr. 54-57. He never submitted the dry cleaning bills to WSB for reimbursement, and does not recall ever discussing his dry cleaning costs with WSB. Exh. D, Horne Tr. 57-58.

32.     Horne never heard of a guard being disciplined for not dry-cleaning the uniform. Exh. D, Horne Tr. 107.

33.     To report the time he was on duty, Horne used the call-in system WSB maintained. When he reported for duty on the site, Horne would call into the voicemail system and leave his name and the time he was reporting to the site. When he was relieved at the end of his shift or whenever his relief actually reported for work, he would call into the voicemail system to report the time he went off duty. Exh. D, Horne Tr. 39-43, 95-96.

34.     Horne said he was not relieved at the end of his shift four to five times a week. Exh. D,

        Horne Tr. 42.

35.     Horne arrived on site 10-15 minutes before his shift began so that he could get the "pass-

        down" information regarding any matters of importance that took place during the

        previous shift. Exh. D, Horne Tr. 39-40. The pass-down information took no more than

        ten minutes. Exh. D, Horne Tr. 52.

36.     The Company maintained a form the guards could use to report missing hours. Horne

        used this form to report hours he claimed to be owed. Sometimes Horne was paid for the

        time he claimed, and sometimes he was not. Exh. D, Horne Tr. 60-64.

37.     Horne said he kept his own time records, but is not sure if he still has them. Exh. D,

        Horne Tr. 59-60.

38.     Horne attended 20 meetings at the location where WSB maintained its vehicles and

        where guards would go to pick up their paychecks issued on a bi-weekly basis. Exh. D,

        Horne Tr. 72-77. Approximately 50 guards from the Dearborn site reported to these

        meetings, the topics at these meetings were specific to the Dearborn site, and each

        meeting lasted at least an hour. Other than signing an attendance sheet, he received no

        documents during these meetings. Exh. D, Horne Tr. 72-77.  Horne learned of these

        meetings from the Site Supervisor and was told they were mandatary. Exh. D, Horne Tr.

        74. Sometimes the meeting occurred during his shift, and sometimes it did not. Exh. D,

        Horne Tr. 88.

**Larry Sextion**

39.     Sextion began his employment with WSB on or about November 20, 2010 and he last

10

worked for WSB on January 3, 2011. Exh. E, Sextion Tr. 9-10, 17. During his job interview with Mike Kiswani, he was told that he had to keep his uniform clean and neat, which he already knew as that requirement is typical of other security companies he has worked for. Exh. E, Sextion Tr. 12, 17-18.

40. As he had done while employed with other security firms, Sextion generally took his uniform to a professional cleaners. This was his choice and he never sought reimbursement for the expense from WSB. Exh. E, Sextion Tr. 18-19.[3]

41. When employed for WSB, Sextion was first assigned to the John Patterson Gym. From there, he went to the Dearborn site for a short period (2-3 days), but spent most of his time employed by WSB working at the Hilliards. Exh. E, Sextion Tr. 19-20. The last place he worked was a site located at 35th and Giles. Exh. E, Sextion Tr. 20.

42. To report the hours he worked, Sextion used the call-in system WSB set up. He would call into the system to report to work five minutes before his shift began. Exh. E, Sextion Tr. 22. When his relief reported to the site, either at the end of his shift or sometime after, Sextion called into the time keeping system to call off duty. Exh. E, Sextion Tr. 22-25. If his relief did not report to the site by the end of his shift, Sextion would contact Serf to report that his relief had not reported. Sextion would then be instructed to stay on post until relief showed up. Sextion said that 70% of the time his relief would be 20-30 minutes late. Exh. E, Sextion Tr. 23-25.

43. Sextion attended one meeting at the Company's garage that was held on the day the

---

[3]Sextion's Answer to Interrogatory No. 8 regarding the time spent cleaning his unform is inaccurate as he is not claiming monies on that basis. Exh. E, Sextion Tr. 51-52.

paychecks were available there for the guards ro pick up. At this gathering, guards were instructed to take the hand-outs that were placed on a table for them to read. This event lasted about 15 to 20 minutes. Exh. E, Sextion Tr. 25-28.[4]

44.     Sextion recalls that the Company required guards to take an unpaid meal break. Exh. E, Sextion Tr. 28. When he worked at the John Patterson site, he and another guard could take their break anytime they wanted after 7 or 8 p.m., once the facility closed, as there was little activity after that. Exh. E, Sextion Tr. 28-30.

45.     At the Dearborn site, Sextion was a rover and he and the supervisor he worked with took a break at a time during the shift when the activity slowed. Exh. E, Sextion Tr. 21-33.

46.     When Sextion was at the Hilliards, the roving supervisor's job was to cover breaks, but that did not occur on 7-8 occasions, due either to an incident delaying the supervisor or because of the supervisors's failure to do his job. Exh. E, Sextion Tr. 33-35.

47.     Sextion claims he did not receive a meal period on approximately four occasions. Exh. E, Sextion Tr. 53.

48.     Sextion is claiming 48-50 hours of unpaid time. He claims that he has not been paid for a couple days he worked at the start of his employment, and he also claims monies for breaks he did not get. He is not claiming monies for off-the-clock time. Exh. E, Sextion Tr. 45-47.

**Fenton Flowers**

49.     Flowers was hired as a guard for WSB at $9.00 per hour around August 19, 2010, and his

_____

[4]Sextion concedes that his Answer to Interrogatory No. 3 as to the number of meetings he attended is wrong. Exh. E, Sextion Tr. 49-50.

employment ended in the summer of 2011. Exh. F, Flowers Tr. 7-8, 29. In his interview with Mike Kiswani, Flowers was asked about his background, told that the Company guards CHA properties, and what his starting pay would be. Exh. F, Flowers Tr. 16-17.

50.    Flowers' uniform consisted of black pants and a short-sleeve shirt. Mike Kiswani told Flowers that the uniform needed to be neat in appearance and suggested he take it to a professional cleaners. Flowers did not consider this suggestion to be a requirement, but did take his uniform to the cleaners, as he had done with uniforms he wore for other security companies. Exh. F, Flowers Tr. 25-28. Flowers does not recall requesting WSB to reimburse him for the cleaning costs, and has no receipts from the cleaning services he used. Exh. F, Flowers Tr. 28-29.

51.    During his employment, Flowers worked at the Dearborn homes, and one day each week, at a gym near the stadium where the Chicago Bulls play. Exh. F, Flowers Tr. 31. He also worked at the Hilliards Homes. Exh. F, Flowers Tr. 31.

52.    While working at the Hilliards and Dearborn Homes, Flowers was assigned as a rover at times, and as a guard at other times. Exh. F, Flowers Tr. 33, 37-38.

53.    To report his work time, Flowers used the call-in /call-out system WSB maintained. Flowers said that his immediate supervisor, whose name he cannot recall, told him to call in to report to duty exactly at the start of his shift. Exh. F, Flowers Tr. 45-47. Flowers does not recall the site he was working at when he was told this. Exh. F, Flowers Tr. 46-47. He also said that Mike Kiswani told him during his interview to report 15 minutes before his shift to receive the "pass-down". Exh. F, Flowers Tr. 48-49.

54.    Flowers described the pass-down process as consisting of reviewing a 1-2 page log

prepared by the guard during the prior shift and any incident reports of unusual

occurrences that took place. Aside from the few times that incident reports are prepared,

the pass-down takes about five minutes to complete. Exh. F, Flowers Tr. 91-98.

55. If his relief was late when he was assigned to guard a building, Flowers would contact the

supervisor to report it, who would instruct him to stay on the post until relief came. Once

the relief arrived, he would call off duty. Exh. F, Flowers Tr. 59-60.

56. When he was a rover, Flowers would call off when his shift ended, as it was not

necessary to wait for relief. Exh. F, Flowers Tr. 58-59.

57. Flowers kept his own records of the hours he worked in small notebooks. He started to

maintain such records after he thought that his second paycheck was short hours, and he

continued to keep such records throughout his employment. Exh. F, Flowers Tr. 62-63.

However, Flowers no longer has these notepads, and he does not know where they are.

Exh. F, Flowers Tr. 62-68.

58. Flowers was instructed that guards were to take a 30-minute meal break during the shift.

Exh. F, Flowers Tr. 75-76. When he worked as a rover, one of his duties was to relieve

guards so they could take their meal period. Exh. F, Flowers Tr. 78. To record meal

period breaks, guards and rovers completed a break log. Exh. F, Flowers Tr. 78-79.

59. Flowers said he completed the break log noting the guards he had relieved for breaks,

even if he had not done so, and that he learned to do this from other rovers. Exh. F,

Flowers Tr. 80. Flowers does not recall discussing the completion of break logs with any

supervisor or member of management. Exh. F, Flowers Tr. 80.

60. Flowers cannot give an approximation of the number of lunch breaks he did not receive.

14

Exh. F, Flowers Tr. 102.

61.    Flowers attended 1-2 meetings a month held at the garage, which would occur the day he

went to the garage to pick up his paycheck. Guards could pick up their paychecks at the

garage between the hours from at least 1:00 pm until later in the evening, and the meeting

he attended took place when he arrived to pick up his paycheck. Any other guards

attending the meeting depended upon whoever was there at the time to get their

paychecks. These meetings lasted anywhere from 15-30 minutes, and are the only

meetings he attended. Exh. F, Flowers Tr. 82-86.

62.    Flowers reported hours he claimed to be missing from his pay and used the missing time

report form WSB had to report them. He did this on at least two occasions, but his claims

were not resolved to his liking, even though he was given the opportunity to hear his call-

in/call-out recordings. Exh. F, Flowers Tr. 70-75, 81-82. Flowers never claimed unpaid

meal breaks he did not get as missing hours he sought from WSB. Exh. F, Flowers Tr

103.

**Lonney Turner**

63.    Turner began his employment with WSB around May 12, 2011, at the rate of $9.00 per

hours, and ended on November 23, 2011. Exh. G, Turner Tr. 8-9, 49-50. During his

employment, Turner was assigned most of the time to the Dearborn homes, but once in

awhile, he worked at the Margaret Day Blake Building. Exh. G, Turner Tr. 16-17.

64.    Turner's uniform that he wore as a guard for WSB consisted of a polo shirt and black or

blue pants. Exh. G, Turner Tr. 13. During his interview for employment with Mike

Kiswani, Turner was told that the uniform had to be clean – "Can't look dirty." Exh. G,

Turner Tr. 7-8, 14:6.

65. To keep his uniform clean, Turner took it to the Laundromat every two weeks and washed it along with his other dark clothes. Exh. G, Turner Tr. 14-15.

66. To report the time he worked for WSB, Turner called in to report that he was on duty five minutes or so before his shift. On occasion, Turner reported to the site 15 minutes before his shift began, but he did not consider himself on duty until his shift began. Exh. G, Turner Tr. 19-21.

67. Turner called off duty once his relief reported to the site. About five or six times, Turner's relief was late reporting for duty, and on those occasions, he contacted the supervisor to report that his relief was late. If he ended up staying on after his shift, he would call in to report that he was off duty once his relief finally showed up. Exh. G, Turner Tr. 22, 23-29.

68. On about two or three occasions, Turner used the Company's missing time report forms to claim monies he believed he was owed. Exh. G, Turner Tr. 27, 34. As a result, Turner said he was paid for some of the time he claimed but not for all. Exh. G, Turner Tr. 27-28.

69. Turner's answers to interrogatories attest that he attended no mandatory meetings, but in his disposition, he testified he attended about three meetings at the garage where he went to pick up his paycheck. Exh. G, Turner Tr. 34-37, 40. Turner learned of meetings from other officers and supervisors who said – "We're going to have a meeting." Tr. 37-38:20-21.

70. If the meeting took place on his scheduled day off, Turner would not attend it. Exh. G,

16

Turner Tr. 39. The meetings Turner did attend took place right before his shift began, and lasted about 20 minutes. Exh. G, Turner Tr. 39-40. Throughout his employment, Turner was provided a 30-minute meal period. Exh. G, Turner Tr. 41-43.

### George Macklin

71.    Macklin was employed with WSB from May 2009 to September 2011, with a starting hourly wage of $10.75. Exh. H, Macklin Tr. 11. Macklin's final rate of pay was $10.90 per hour. Exh. H, Macklin Tr. 78.

72.    Macklin was first assigned to Cabrini Greens, and after about a year, he was assigned to Ickes for about four to five months. From there, he worked at Lake Park for nine months, and finally to Dearborn Homes, which was the last place he worked. Exh. H, Macklin Tr. 15-16.

73.    Macklin's uniform consisted of black BDU pants and a polo shirt, which he understood he was to keep "neat at all times." Exh. H, Macklin Tr. 16-17:5-6. To keep his uniform neat, Macklin took it to the cleaners, but when he did not have the money, he washed and ironed it himself. Exh. H, Macklin Tr. 18-19. Macklin never spoke with WSB as to the means he was employing to maintain a clean and neat uniform, and never sought pay for the dry cleaning expense. Exh. H, Macklin Tr. 19-20.

74.    To call in to report when he was on and off duty, Macklin would use the telephone at the site, and leave a voicemail message of when he was going on duty and when he was going off duty. Exh. H, Macklin Tr. 20-21.

75.    Macklin reported to the work site at least 15 minutes before the time he was scheduled to start, at which time, he would call in to report he was on duty as of the start of his shift.

Exh. H, Macklin Tr. 22, 98. When he arrived to the site, Macklin would speak with the guard who he was relieving regarding incidents occurring on the previous shift he should know about, and he would review any reports that were related to any such incidents. Depending upon the number and type of incidents discussed, this process would take "maybe five or eight or ten minutes." Exh. H, Macklin Tr. 22-24 and 23:2-3.

76.     Macklin believes that it is a good practice for guards to report 15 minutes before their shift to perform a pass-down. Exh. H, Macklin Tr. 92-93. Although he said he practiced this, Macklin said that "[l]ots of them" working for WSB did not do this, although "lots of them do." Exh. H, Macklin Tr. 96-97:10, 12.

77.     Macklin did not recall WSB having a policy requiring guards to report 15 minutes before their shift, he never spoke to a supervisor or member of WSB's management of his practice to report to duty 15 minutes before his shift, and he has no knowledge of any guard being disciplined for not reporting to the site 15 minutes before his or her shift. Exh. H, Macklin Tr. 93-94, 97-98. Macklin considered it a guard's choice to decide whether to engage in this practice. Exh. H, Macklin Tr. 97.

78.     At the end of his shift, Macklin would call in to report he was going off duty, but he said that sometimes his relief was late, which kept him from leaving until someone showed up to relieve him. Exh. H, Macklin Tr. 24. On one occasion when he said he stayed to 3 a.m. in the morning, he first stated that he believed he called into the voicemail system when he left at 3 a.m. in the morning, but then said that he might have called off at midnight, which was the end of his scheduled shift. Exh. H, Macklin Tr. 33-34.

79.     Macklin did not regularly stay past his shift, and thinks that other than the occasion when

he stayed until 3 a.m., he recalls staying over three or four times. Exh. H, Macklin Tr. 34. On those other occasions, he called in to report that he had gone back on duty and then called again to report when he went off duty. Exh. H, Macklin Tr. 35.

80.     Through the end of 2009, WSB paid for all time guards were on site including any meal breaks they took. Exh. H, Macklin Tr. 37, 39. While working at the Cabrini site, the Company changed its meal period policy. Under the new policy, the 30-minute meal period was unpaid. Exh. H, Macklin Tr. 37, 39. Macklin does not recall any occasion where he did not get his 30-minute break, other than one occasion while working at Lake Park. Exh. H, Macklin Tr. 39-40, 47. Macklin would be relieved from duty by a supervisor so that he could take his break. Exh. H, Macklin Tr. 39-40, 43.[5]

81.     When Macklin was assigned the Harold Ickes site, the Company began using a break log that would list the time breaks were provided. Exh. H, Macklin Tr. 44-45. Except the Dearborn Homes, Macklin worked along with another guard at the site he worked. Exh. H, Macklin Tr. 45. At the Ickes, a vacant apartment was provided where guards could go to take their meal break. Exh. H, Macklin Tr. 45-46. While working the Ickes site, the other guard Macklin worked along with would cover the post while he went off duty to take his meal break. Exh. H, Macklin Tr. 46.

82.     When Macklin worked at the Dearborn site, he assumed the role of a roving guard. In that role, he would be in charge of certain buildings and would relieve guards in those buildings so that they could take their 30-minute meal breaks. Exh. H, Macklin Tr. 48-49.

---

[5] On one occasion, Macklin was called to assist in handling an incident involving gang members attacking two roving officers, which required him to break away from his meal period. Once the incident was handled, Macklin returned to finish his lunch. Exh. H, Macklin Tr. 41-43.

When the supervisor prepared the break log at the start of the shift, Macklin would note the guards he was to relieve and the times their breaks were to be provided. Exh. H, Macklin Tr. 49.

83. Throughout his employment, Macklin recalls attending about five meetings for which he was not paid. Exh. H, Macklin Tr. 49-50. The meetings held while he was working at the Dearborn Homes took place at the garage or on site, either in a room or a place on the grounds, such as a parking lot. All the other meetings he attended while working at sites other than the Dearborn homes occurred at the site. Exh. H, Macklin Tr. 50-52. Macklin attended two meetings while employed at Cabrini, two at Dearborn Homes, one at Lake Park, and one at Ickes. Exh. H, Macklin Tr. 52, 58. The meetings at Cabrini and the Dearborn homes lasted about one hour. Exh. H, Macklin Tr. 59. Three of the meetings were held to address issues the site management had raised with WSB. Exh. H, Macklin Tr. 53-54. The meeting at the Ickes site lasted about 20-30 minutes, and addressed the upcoming closing of the facility. Exh. H, Macklin Tr. 58.

84. Macklin heard of other meetings held at other sites, but since he did not work at those sites, he did not have to attend them. Exh. H, Macklin Tr. 56-57. He attended all of the meetings that were called at the sites he worked. Exh. H, Macklin Tr. 57. He never heard of anyone being disciplined for not attending a meeting. Exh. H, Macklin Tr. 64-65.

85. Macklin reported monies he claimed he was owed on two occasions. The first occurred when the Company deducted $55.00 from his pay for the issuance of a TAN card. The second occurred over the child support deductions the Company was required to take from his pay. Exh. H, Macklin Tr. 65-70.

86.    Macklin used time sheets the Company provided the employees for purposes of tracking
       their work time when his "check didn't look right," but then stopped after "about two pay
       periods." Exh. H, Macklin Tr. 72-73:1-2, 6. Macklin recalls that in response to him
       bringing to WSB's attention that they were still deducting for his uniform, it returned the
       amount deducted in Macklin's next pay. Exh. H, Macklin Tr. 74-75.

### Alicia King-Booker

87.    King-Booker was hired by WSB on June 6, 2010 at $9.00 per hour; her employment
       ended on January 13, 2012. Exh. I, King-Booker Tr. 9, 19, 56. The uniform she wore for
       WSB consisted of a black polo shirt and pants made of a polyester blend. She washed her
       uniform separately from her other clothes by placing it in the washing machine with the
       garments turned inside out. She ironed her uniform and the T-shirt she wore underneath
       (which was not part of her uniform). Exh. I, King-Booker Tr. 12-17.

88.    King-Booker decided on her own the means she would employ to keep her uniform clean,
       and she had no discussion with WSB management as to how to keep her uniform neat and
       clean. She also cleaned her boots with soap and water as needed. Exh. I, King-Booker Tr.
       12-17.

89.    King-Booker was first assigned to Cabrini Green until August 1, 2010. Then, she was
       moved to the Dearborn Homes. She worked the 4 p.m. to midnight shift at both locations.
       Exh. I, King-Booker Tr. 20, 22.

90.    To report the time she was on duty, King-Booker used WSB's call-in system by using the
       phone available on-site and leaving her name, the site she was working, and the time she
       reported to be on duty. Exh. I, King-Booker Tr. 22-24. She would report to the job site

about five minutes before her shift began. Exh. I, King-Booker Tr. 44-35. She would then use the call-in system to call off duty whenever the guard reported to the site to relieve her. Exh. I, King-Booker Tr. 35-36, 71-72.

91.    When she worked at Cabrini, King-Booker worked along with other guards at a post. She also shared a post with another guard when first assigned to the Dearborn Homes, but once the number of buildings expanded from eight to sixteen, which occurred within 2-3 months from being assigned there, only one guard was assigned to a building during the shift. Exh. I, King-Booker Tr. 24-28.

92.    While assigned to Dearborn Homes, she was assigned as a rover on one occasion. Exh. I, King-Booker Tr. 28, 30. In that role, she drove around in a car monitoring the overall site, and relieved guards so that they could take their meal breaks. Exh. I, King-Booker Tr. 28-30.

93.    WSB provided a 30-minute unpaid meal period while King-Booker worked for it. Exh. I, King-Booker Tr. 47. When she was assigned to a post at the Dearborn Homes, there were times that she was not relieved by a rover to take her meal break, due to the shift being short-staffed. On those occasions, supervisors would sometimes relieve her for her meal break. Exh. I, King-Booker Tr. 30. King-Booker was not relieved to take a meal break two to three times a month. Exh. I, King-Booker Tr. 32-33.

94.    King-Booker signed break logs showing meal breaks she took, and sometimes she signed the log, even though she did not take a meal break. Exh. I, King-Booker Tr. 72-73. On about 30 occasions, King-Booker told the rover who reported to her site to relieve her for her meal break that she did not want a break. On those occasions, however, she still

signed the break log indicating she took a break. Exh. I, King-Booker Tr. 73-74, 78-79. Even though King-Booker understood she was not going to be paid for the time she worked through her break, she preferred to stay on post, and maintains that she is not claiming wages for not taking meal breaks she preferred not to take. Exh. I, King-Booker Tr. 74, 76-77.

95.     King-Booker never submitted a missing time report for any occasion she worked through her meal break. Exh. I, King-Booker Tr. 88-89.[6]

96.     King-Booker used a time sheet the company provided guards to track the hours she worked. Exh. I, King-Booker Tr. 37-39. She would keep them for purposes of comparing them with the hours she was paid, and then discard them afterwards. Exh. I, King-Booker Tr. 39-40.

97.     King-Booker contacted the Company when she believed she was not paid for all the hours she worked. Exh. I, King-Booker Tr. 39-40. She said that she reported such discrepancies "a lot", from every paycheck to every other paycheck. Exh. I, King-Booker Tr. 40-42, 44-47. On one occasion, King-Booker went to Abraham Kiswani for not getting paid for working a double shift. Exh. I, King-Booker Tr. 42-43. She said that while she was then paid for the doubt shift, she contends she should have been paid at an overtime rate for that work. Exh. I, King-Booker Tr. 43-44. After that incident, she never worked another double shift. Exh. I, King-Booker Tr. 44.

98.     When she worked at Cabrini Green, King-Booker attended no meetings. Exh. I, King-

---

[6]King-Booker does not recall whether she was provided meal breaks while working at Cabrini. Exh. I, King-Booker Tr. 79.

Booker Tr. 47. While working at the Dearborn Homes from August 1, 2010 through the last date of her employment on January 13, 2012, she attended three meetings, one in 2010 and the other two in 2011. Exh. I, King-Booker Tr. 48-49, 56. She also said that there may have been two other meetings that were held other than the meetings she attended, but for no particular reason, she decided not go to them. Exh. I, King-Booker Tr. 49, 55-56. The meeting in 2010 took place in a meeting room at the Dearborn Homes, started about 10 a.m., and lasted about one hour. Exh. I, King-Booker Tr. 49-51. There were about 25-30 guards in attendance, and she learned of the meeting from other guards. Exh. I, King-Booker Tr. 50. The other two meetings were also held at the Dearborn homes' meeting room, each starting at about 10 a.m.. About 30 guards attended the meeting held in the summer and 20 attended the second meeting that took place in the winter. The meeting in the summer was 1.5 hours in length and the winter meeting lasted about 30 to 45 minutes. Exh. I, King-Booker Tr. 51-55. Other than the meetings she attended, King-Booker claims no other work she performed off the clock. Exh. I, King-Booker Tr. 72.

**Ed Reed**

99.    Reed was hired by WSB as a guard at $9.00 per hour on February 23, 2011. Exh. J, Reed Tr. 7.  His employment ended around November 2011. Exh. J, Reed Tr. 135. The uniform he wore while employed with WSB consisted of a black cotton polo shirt and pants. Exh. J, Reed Tr. 11-12. He was told by a shift supervisor that his uniform should be "clean, ironed, and well fitting, not loose or baggy." Exh. J, Reed Tr. 12:15-16. At first, Reed took his uniform to the dry cleaners, but after doing that three times, he decided that it

was "better and cheaper to just wash it with a washer and dryer." Exh. J, Reed Tr. 13:7-8.

His girlfriend would wash his uniform and his other clothes every Sunday, and he would

iron his uniform which took him about 20 minutes. Exh. J, Reed Tr. 14-16.

100.    Reed was mainly assigned to work at the Dearborn Homes. Exh. J, Reed Tr. 19. He was

also assigned to guard a senior building on three occasions, a site located at 35th and Giles

on one occasion, security of a private party. Exh. J, Reed Tr. 19-23.

101.    To report the times he was working, Reed called in at least five minute before his shift

started to report he was on duty. Exh. J, Reed Tr. 23-24, 30. Before he called to report he

was going on duty, he would, if time permitted, perform a walk-down of the building,

which took about five minutes. Exh. J, Reed Tr. 24-26, 29. He did this at least four times

a week. Exh. J, Reed Tr. 28-29.

102.    Reed used the call-in/call-out procedure to report he was off duty once a guard reported to

relieve him. Exh. J, Reed Tr. 30. If a guard had not reported on time to relieve Reed once

his schedule shift ended, he would contact the rover over the walkie-talkie and let the

rover know of this. Exh. J, Reed Tr. 31. Reed would then stay on post until a guard

arrived. Exh. J, Reed Tr. 31. On the occasions that the guard scheduled to relieve him

never reported, Reed would be relieved either by a rover or a supervisor. Exh. J, Reed Tr.

32-33. Once relieved by the scheduled guard, or rover or supervisor, Reed would then call

off duty. Exh. J, Reed Tr. 32. Reed said the guard scheduled to replace him was routinely

late. Exh. J, Reed Tr. 32.

103.    Three months into his employment, Reed started to keep a notepad to log activity on the

site, as well as to track his time so he could make sure he was getting his proper pay. Exh.

J, Reed Tr. 36-37. Reed threw these logs away and no longer has them. Exh. J, Reed Tr. 38-39.

104. To claim missing hours he thought was due him, Reed contacted human resources and completed a missing hours report so that it could be investigated. Exh. J, Reed Tr. 41-42. He did this on two occasions. On the first occasion, the Company paid the deficiency that was claimed, but he does not know if the claim he reported the second time was paid. Exh. J, Reed Tr. 43-45.

105. Reed attended two meetings in a conference room at the Dearborn Homes, both of which lasted about 45 minutes. Exh. J, Reed Tr. 45, 47-48.[7] Most of the second shift guards working at the Dearborn facility were there. Ech. J, Reed Tr. 48-49. Reed was told he would be paid to attend the two meetings he attended, but he did not see it as an additional payment on his paycheck. Exh. J, Reed Tr. 122. He never submitted a missing time request for that time. Exh. J, Reed Tr. 122.

106. During the shift, rovers would assign the times guards would take their unpaid 30-minute break, and then relieve guards during the shift for that purpose. Exh. J, Reed Tr. 50-52. That was the practice until April or May, 2011, but from that point through the remainder of his employment, Reed was either not relieved by a rover for his break or had his break shortened to 15 minutes, about three to four times during the week. Exh. J, Reed Tr. 52-53. Reed said he reported to Serf in June 2011 that he was not getting his meal breaks to which Serf responded that they were short-staffed. Exh. J, Reed Tr. 100-101.

---

[7]Although his answer to his interrogatories state that he attended four to five mandatory meetings lasting about 30 to 40 minutes, Reed attests his deposition testimony that he attended two meetings is more accurate. Exh. J, Reed Tr. 136-137.

107.    If the shift was short a rover, a regular guard was appointed to act as one to cover for

breaks, and Reed never submitted any missing time report for meal breaks he was denied.

Exh. J, Reed Tr. 70, 90-91, 101.

108.    At the start of his shift, Reed was presented with a break log noting when his meal period

was, which he would sign/initial. Exh. J, Reed Tr. 54-55. Sometimes he would be asked

by rovers at the start of his shift when he wanted to take his break, and other times he was

just given the time the rovers chose and was not given a choice. Exh. J, Reed Tr. 73-74,

94-95.[8]

109.    About once a week when a rover came to relieve Reed for his meal break, he decided not

to take it. Exh. J, Reed Tr. 105. Reed never reported to a supervisor that he was choosing

to work through his break. Exh. J, Reed Tr. 108.[9]

**Latondra Ingram**

110.    Ingram was hired as a guard in or around March 2, 2011 at $9.00 per hour, and her

employment ended in February 2012. Exh. K, Ingram Tr. 7-8, 74-75. She was interviewed

by Mike Kiswani, and although she said she did not recall the content of the discussion,

she later said that Mike Kiswani told her that her uniform should be cleaned and pressed,

which she understood to mean that she had to have it professionally cleaned. Exh. K,

Ingram Tr. 10, 26-27, 29.

111.    Ingram took her uniform to the cleaners once a week, and did not wash it herself. Exh. K,

---

[8]Reed concedes to break logs he signed or initialed establishing he got a lunch break, particularly when he signed the log at the end of his shift. Exh. J, Reed Tr. 62-63, 66.

[9]Reed claims he is not seeking pay for the times he turned down the relief the rover offered. Exh. J, Reed Tr. 107.

Ingram Tr. 28. She never told WSB she was taking her uniform to the cleaners and never sought reimbursement for the cost of doing so. Exh. K, Ingram Tr. 29-30.

112.    During her employment, Ingram was assigned to a senior building located on West Elm and the Dearborn Homes. Exh. K, Ingram Tr. 35-36. She said she was assigned the West Elm location until soon after the lawsuit was filed, after which she was assigned only to the Dearborn Homes. Exh. K, Ingram Tr. 36-37. Other than the three-month period she worked as a rover at the Dearborn site, Ingram was assigned as a guard to secure a building. Exh. K, Ingram Tr. 74-76, 90-91, 189.

113.    Ingram learned from post orders located on-site and from someone working at the Dearborn site that she was to call in to report when she went on duty and when she went off. Exh. K, Ingram Tr. 37-38. Ingram would use the call-in system to call off duty only when her duty-time actually ended, even if that occurred past her scheduled shift. Exh. K, Ingram Tr. 72.

114.    Ingram said she worked passed her shift about 80 percent of the time, from anywhere from 10 to 30 minutes, because the guard who was scheduled to relieve her was late Exh. K, Ingram Tr. 73, 76.

115.    During the three-month period she was a rover, Ingram attended about six meetings, although she also said the meetings occurred once a month. Exh. K, Ingram Tr. 52, 74-76, 90-91, 189.

116.    During the period she was assigned as a guard, she attended four to six meetings. Exh. K, Ingram Tr. 49. The meetings she attended as a guard took place at the garage or any one of the 16 buildings at the Dearborn homes. Exh. K, Ingram Tr. 49-50. The meetings at the

garage were scheduled to start at 8 a.m., and lasted 30 minutes to an hour. Exh. K, Ingram Tr. 51. The meetings occurring at the Dearborn site started around 8:30 a.m., and they lasted about one hour. Exh. K, Ingram Tr. 53-54.

117.  All of the meetings she attended when assigned as a rover took place at the garage, most of which started at 8 a.m., while others were scheduled for 10 a.m. Exh. K, Ingram Tr. 54-55.

118.  The Company used a break log to document the half-hour breaks guards were provided. Exh. K, Ingram Tr. 78. As a rover, Ingram used this form, and filled it in at the start of her shift. Exh. K, Ingram Tr. 78-79. Ingram said that Mike Kiswani instructed her that the form had to be filled in. Exh. K, Ingram Tr. 79.

119.  For those guards who got breaks, the times would be filled in and if they got no break, Ingram said she would still put a time in. Exh. K, Ingram Tr. 79-80. Ingram understood Mike Kiswani's direction about filling out break logs as an instruction to complete it whether it was accurate or not. Exh. K, Ingram Tr. 101-102.

120.  Two rovers have a combined total of four hours during an eight-hour shift to cover the meal breaks for the eight guards, or two hours for each rover during the shift. Exh. K, Ingram Tr. 195-199. Aside from a rover's regular duties, such as performing walk-downs that would take 8-10 minutes, a rover would be unable to provide lunch breaks, because they were involved in handling other situations, such as when police are called or a fight on the site occurs. Exh. K, Ingram Tr. 123-127. For example, Police activity occurred about once a week, and would take two to three hours to address. Exh. K, Ingram Tr. 125-127. A fight that would not involve the police occurred about twice a week, and would

take a couple of hours to handle. Exh. K, Ingram Tr. 125-126. When a rover, Ingram said time was not available two to three times a week for her to provide breaks to guards. Exh. K, Ingram Tr. 80.

121.     Ingram did not get her meal break two to three times a week, because of a shortage in staff. Exh. K, Ingram Tr. 195.

122.     Ingram said that the Company would assign another guard to the site to assist in covering for lunches when the site was short-staffed. Exh. K, Ingram Tr. 142-143, 151-152.

123.     Ingram claimed missing hours she was not paid for by submitting a Company form for that purpose. Exh. K, Ingram Tr. 67, 76-77. She did this on four to five occasions, but she said that none of those claims were ever resolved. Exh. K, Ingram Tr. 67, 69. The missing time she was claiming consisted of meetings she attended and time she worked past her shift. Exh. K, Ingram Tr. 72. Ingram does not recall the total number of hours she claimed, and she stopped reporting missing hours early on in her employment. Exh. K, Ingram Tr. 69, 71.

124.     Ingram kept track of the hours she worked on her phone, which she no longer has because that phone was stolen. Exh. K, Ingram Tr. 62.[10]

125.     Throughout her employment, Ingram also wrote down the hours she worked. Exh. K, Ingram Tr. 65. Although she said she has these records, she has not produced them. Exh. K, Ingram Tr. 66.

---

[10]Ingram had that phone for a period of six to seven months of her employment. Exh. K, Ingram Tr. 62-63.

**Statement of Legal Position**

126.    A collective action is designed to permit the evidence from certain representative

plaintiffs to serve as evidence for the class as whole. Here, individualized adjudication of

the claims asserted by the opt-in Plaintiffs is necessary to resolve the wage claims raised

in this action.

127.    Plaintiff has failed to show a single policy Defendants have implemented that constitutes

a violation under the FLSA.

128.    The disparity in the factual and employment settings of the individual opt-in Plaintiffs,

the various defenses available to Defendants with respect to the individual opt-ins, and

fairness and procedural considerations make proceeding with this case as a collective

action impractical and prejudicial to the parties.

129.    In support of this Motion, Defendants attach their Memorandum of Law in support.

WHEREFORE, for the reasons set forth in this Motion and attached Memorandum of Law,

Defendants request that the Court decertify the conditional certification of the Plaintiffs'

collective action.

Respectfully Submitted,


 /s/Mark Hansen
Mark Hansen, Attorney for
Defendants, World Security Bureau, Inc.,
and Dena Halloway

Mark Hansen
Anthony S. Graefe
Graefe & Hansen, Ltd.
55 West Monroe, Suite 3550
Chicago, IL 60603
(312) 236-0177

31