IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LATONDRA INGRAM, Individually, and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 11-cv-6566 |
| v | ) ) | |
| WORLD SECURITY BUREAU, INC. and DENA HALLOWAY, | ) ) ) | (JURY TRIAL DEMANDED) |
| Defendants. | ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DECERTIFY**

Now Comes the Defendants, World Security Bureau, Inc. ("WSB") and Dena Halloway, by and through their attorneys, Anthony S. Graefe and Mark Hansen, Graefe & Hansen, Ltd., and in support of their Motion to Decertify the Conditional Class Designation, submits this Memorandum of Law as follows:

**Argument**

**Legal Standard**

The FLSA authorizes persons to file collective actions on behalf of themselves and other "simply situated" employees. *Rottman v. Old Second Bancorp, Inc.* 735 F. Supp. 2d 988, 940 (N.D.Ill. 2010). "[C]ourts in this district and around the country have settled on a two-step procedure for dealing with collective actions under the FLSA." *Id.* At the first step, "[p]laintiffs only need to make a minimal showing that others in the potential class were similarly situated." *Mielke v. Laidlaw Transit, Inc.*, 313 F. Supp. 2d 759, 762 (N.D.Ill. 2004). At the second step,

1

following discovery, "'the court's inquiry is more stringent' because the factual record determines whether the plaintiffs are similarly situated." *Russell v. Illinois Bell Co.*, 721 F.Supp. 2d 804, 811 (N.D.Ill. 2010). The FLSA does not define the term "similarly situated", but courts, in determining whether the similarly situated element is met at the second-step, have fashioned a set of factors for review, which include "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant with respect to the individual plaintiffs; and (3) fairness and procedural considerations." *Reed v. County of Orange*, 266 F.R.D. 446, 449 (C.D. Cal. 2010); see *Russell*, 721 F.Supp. 2d at 811; *Smith v. Heartland Automotive Servs. Inc.*, 404 F. Supp. 2d 1144, 1149 (D. Minn 2005). The burden is on the plaintiffs to show that they are similarly situated. *Russell*, 721 F.Supp. 2d at 811. Moreover, it "is not sufficient for plaintiffs' evidence to merely 'successfully engage' the competing evidence offered by the defendant, rather, it is plaintiffs' burden to provide substantial evidence to demonstrate that they are similarly situated." *Reed*, 266 F.R.D. at 449.

In evaluating the first factor "courts also evaluate whether plaintiffs have provided substantial evidence that their claims arise out of a single policy, custom or practice that leads to FLSA violations." *Reed*, 266 F.R.D. at 450. "An allegation of an overarching policy is generally insufficient; plaintiffs must produce substantial evidence of a single decision, policy or plan." *Id.* at 458. Plaintiffs must demonstrate "similarity beyond simply claiming that the FLSA has been violated; an identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of overtime laws generally must be present." *Russell*, 721 F.Supp. 2d at 812. Absent such substantial evidence, decertification is appropriate. *Reed*, 266 F.R.D. at 450. In this way, where employees are "subject to varying working conditions in different work locations or

2

different supervisors," decertification is appropriate. *Id.*

With regard to the second factor, the courts look to the defenses involved, and whether the nature of the available defenses call for litigation on an individual basis. *Id*. at 460. For example, the question whether the Defendants were aware of the alleged off-the-clock work is highly individualized and the "inability to cross-examine the vast majority of opt-in Plaintiffs on this issue would be unfairly prejudicial." *Id*. at 461.

In analyzing the third factor, courts look to the purpose of §216(b) actions under the FLSA of "reducing the burden on plaintiffs through the pooling of resources, and [ ] efficiently resolving common issues of law and fact that arise from the same illegal conduct." *Morgan v. Family Dollar Stores, Inc.*, 551 F. 3d 1233, 1264 (11th Cir. 2008). In doing so, where courts find that the claimed violations are driven by facts and circumstances specific to each opt-in plaintiff requiring individual adjudication, they hold that any benefit of "pooling Plaintiffs' resources is outweighed by the need for individual mini-trails." *Cruz v. Lawson Software, Inc.*, 704 F. Supp. 2d 1050, 1063 (D. Minn. 2011). Thus, when "the jury trial would consist of a large number of separate mini-trials and would consume significant judicial time and resources," decertification of the collective action is appropriate. *Reed*, 266 F.R.D. at 463. "Multiple individual trials on the merits is the antithesis of a collective action." *Id*.; *Johnson v. Big Lots Stores, Inc.*, 561 F.Supp. 2d 567, 586 (E.D. La. 2008).

### Meal Period

Plaintiff Ingram claims the WSB violated her rights and those similarly situated with regard to its practice to not pay them for a 30-minute meal period they were required to take. Before January 2010, WSB's policy was to pay for any meal period the guard was provided.

Motion, ¶¶ 10, 20. After that date, however, the Company instituted a policy that provided that all guards at certain sites were required to take a 30-minute unpaid meal break during their shift. Motion, ¶ 10

Guards who worked with one or more guards at a post would secure the site alone while the other guard took his/her meal period, or they would take the break together during a period when there was little to no activity. Motion, ¶¶ 23, 44, 81. When breaks would be taken was determined by the guards themselves or the supervisor. Guards who worked alone at a post would be relieved by a rover assigned to the area, by a guard who was brought in to relieve guards for breaks, or by a supervisor. Motion, ¶¶ 58, 80, 82, 93, 107, 122. Guards assigned as rovers would take their break at a time when the shift activity had slowed or after they completed relieving the other guards for their breaks. Motion, ¶¶ 21, 45.

The duties of rovers regularly assigned to a shift specifically included relieving guards for their meal period. The Company further instituted the use of a break log to document the meal breaks guards were provided. These logs were completed by rovers, supervisors, and often, guards, who would write their names and initials noting the breaks they received. Motion, ¶¶ 21-2, 30, 58, 82, 94, 108, 118. Some rovers said they falsified break logs, because other rovers did it or claim to have been instructed to do so, while others simply performed the job of covering for breaks as noted on the logs. Motion, ¶¶ 29-30, 58-59, 82, 118-119.

"Bona fide meal periods are not work time...Ordinaryly 30 minutes or more is long enough for a bone fide meal period." DOL Field Operations Handbook, § 31(b)(23) (Dec. 15, 2000). Providing a 30-minute meal period to the guards that is unpaid is not a violation of the FLSA, and thus nothing in the Company's meal period policy supports a claim for unpaid wages.

Further, the measures WSB took to insure that meal breaks could be provided, such as the deployment of rovers or guards specifically for that purpose, and the development of a break log documenting the meal breaks taken, undermines any class-based claim on this issue.

A highly individualized inquiry of the facts and circumstances of the meal periods not provided each particular guard would be necessary to resolve a claim on this basis. Indeed, one guard does not claim he was denied a meal period, while another claims to have been denied a meal period on one occasion. Motion, ¶¶ 70, 80. Others claim to have been denied meal periods from a handful of times, to 2-3 times a month, to less than half of the time, to a majority of the time, while another was unable to even approximate the number of breaks missed. Motion, ¶¶ 21, 30, 46-47, 60, 93, 106, 121. Further, the explanation for not getting meal periods depended upon different facts. Some said that it was due to a shortage of available staff to relieve the guard, while others said it was due to the supervisor failing to do his job. Motion, ¶¶ 30, 46, 93, 120-121. Others said it was because they preferred not to take it, even when a rover reported to their post to relieve them. Motion, ¶¶ 22, 94, 109. Indeed, one guard took his break only after being threatened with discharge if he persisted to refuse. Motion, ¶ 22.

Moreover, the unpaid meal period policy that was implemented after January 2010 did not apply to all sites. Some sites retained the old policy, such as the senior citizen apartment buildings to which guards were assigned. Motion, ¶¶ 10, 20. Other sites, such as Dearborn Homes, were under the new policy. Motion, ¶ 21. In addition, guards assigned at sites where two or more guards worked as a team did not have to wait for someone to relieve them to take their break, as their break times could be decided by themselves. Motion, ¶¶ 23, 44, 81. Similarly, guards who were assigned as rovers were free to take their break whenever they considered it

5

suitable to do so. Motion, ¶¶ 21, 45.

For the reasons stated, the meal period policy is not a proper claim for class-wide treatment, as only individualized inquiry can fairly adjudicate a claim for unpaid wages on this issue. Decertification is appropriate where "the disparity between Plaintiffs' factual and employment settings as to ... their meal periods result in highly individualized questions of fact that make proceeding as a collective action impractical and prejudicial to the parties." *Reed*, 266 F.R.D. at 450.

### Uniform Maintenance

Plaintiff Ingram alleges that she and those similarly situated were denied pay in violation of the FLSA for the time they spent maintaining their uniform. Employers are not required to reimburse employees for the cost of uniform maintenance "where uniforms are (a) made of 'wash and wear' materials, (b) may be routinely washed and dried with other personal garments, and (c) do not <u>require</u> ironing or any other special treatment such as dry-cleaning, daily washing, or commercial laundering." DOL Fields Operations Handbook, §30 c12(b) (Dec. 9, 1998)(emphasis in original).

Here, the evidence demonstrates that the uniform worn by WSB guards was made of wash and wear materials, could be routinely washed and dried with other garments, and did not require ironing or other special treatment. Motion, ¶¶ 16, 31, 64, 65, 73, 87, 99. Further, aside from the evidence showing that reimbursement for uniform maintenance in this case is not required by the FLSA, a highly individualized inquiry would be necessary to analyze the facts and circumstances of each employee's uniform cleaning habits.

Some guards washed their uniform along with other garments, while others washed them

separately using a standard washer and dryer. Motion, ¶¶ 16, 65, 87, 99. A few ironed their uniforms. Motion, ¶¶ 73, 87, 99. Some had someone else wash their uniform, either by using a standard washing machine or by taking it to a dry cleaners. Motion, ¶¶ 31, 40, 50, 73, 99, 111. Indeed, some who chose to take their uniform to the cleaners, decided on other occasions to wash it themselves; one claims to have hand-washed his uniform on the occasions he did not take it to the cleaners. Motion, ¶¶ 31, 73, 99. None ever sought reimbursement by the Company, or even told the Company the means they were using to clean their uniform. Motion, ¶¶ 31, 40, 50, 73, 111.

Further, most guards said that the Company provided limited instruction on the means to maintain their uniform, and said little more than that they were to keep it clean. Motion, ¶¶ 16, 39, 50, 64, 73, 88, 99. Only two guards claim to have understood they were to have a professional laundry service clean their uniform, while the others who used an outside service said they did so on their own accord. Motion, ¶¶ 31, 40, 50, 73, 110. For these reasons, aside from the Plaintiffs inability to show a violation of the FLSA with regard to the uniform maintenance claim, this claim is dominated by individualized inquiries, and is not appropriate for adjudication on a class-wide basis.

### Mandatory Meetings

Opt-in plaintiffs claim they were required to attend mandatory meetings while employed for which they were not paid. However, the disparity in the number of meetings attended by the guards is striking. For example, while Brown said he attended 5-6 meetings during his entire four years of employment, Horne claims he attended 20 meetings during his brief 2½ month tenure. Motion, ¶¶ 16, 25, 27, 38. Further, this disparity occurs even among guards who worked the

same site during the same period of time. For example, though Reed said he attended two meetings, Ingram said she attended 10-12 meetings, and Horne said he attended 20 meetings, even though their work histories overlap in the time period and locations they worked. Motion, ¶¶ 27-28, 38, 99, 105, 110, 116-117.[1]

The notion that the meetings were mandatory is not only belied by the divergence in the number of meetings the guards attended, but by the fact that some guards said they did not attend a mandatory meeting if it was scheduled on their day off, or if they just decided not to attend. Motion, ¶¶ 70, 98. In addition, not only did guards describe different places where the meetings occurred, sometimes in a room at the site, Motion, ¶¶ 83, 98, 105, 116, other times just outside at the site, Motion, ¶ 83, and other times at the Company's garage, Motion, ¶¶ 38, 43, 61, 83, 116, the circumstances by which the meetings were organized are not consistent. For example, one guard said he attended meetings on the day he arrived at the garage on payday to pick up his paycheck. Motion, ¶ 61. How the Company could schedule a mandatory meeting at a specific time when guards arrive to the garage on payday to pickup their paycheck any time during the course of the day defies common sense. In fact, in describing this meeting, the guard said that the number of guards attending depended "on how many guards there were to pick up their checks at the time." Motion, ¶ 61, Exh. F, Flowers Tr. 85:4-5. Another guard described a mandatory meeting as consisting of an occasion at the garage where guards were asked to pick-up several documents on the table. Motion, ¶ 43.

---

[1] Sextion attended one meeting during his three months of employment; Flowers said he attended 1-2 meetings each month; Turner attended three meetings over a period of six months of employment; King-Booker attended three meetings during her 18 months of employment; and, Macklin attended five meetings over his more than two years of employment. Motion, ¶¶ 39, 43, 61, 63, 69, 71, 83, 87, 98.

8

Further, while some guards described meetings lasting 15 to 30 minutes, other guards said the meetings lasted one to three hours. Motion, ¶¶ 25 (2-3 hours), 38 (one hour at least), 43 (15-20 minutes), 61 (15-30 minutes), 70 (20 minutes), 83 (20 minutes to one hour), 98 (30 minutes to 1½ hours), 105 (45 minutes). Finally, the guards described the meetings as specific to the site where they were assigned at the time, and guards who were not assigned to a site where a meeting was called, did not attend. Motion, ¶84. Similarly, according to named Plaintiff Ingram, meetings were not just site specific, but role-specific. That is, some meetings were set just for guards assigned as rovers, while others were set for the guards assigned to a building. Motion, ¶¶ 116-117.

In short, the issues requiring individualized treatment on the Opt-in Plaintiffs' claims over attending mandatory meetings are as numerous as the number of guards who testified on the matter. It is not appropriate for class treatment. "Decertification is appropriate where plaintiffs are subject to varying work conditions in different work locations or different supervisors." *Reed*, 266 F.R.D. at 450.

**Pre-shift Work**

Opt-in Plaintiffs assert a class claim for work performed before their scheduled shift. Yet, the record fails to support any evidence that WSB maintained a policy requiring guards to perform work before their shift. Moreover, there is no evidence in the record of any guard being disciplined for not reporting 15 minutes before their shift to perform a pass-down, while there is abundant evidence of guards, such as many of the guards who were deposed, receiving written

9

warnings for not reporting to work at the start of their shift. Exhibit B.[2]

Further, the evidence demonstrates that while some guards said they reported before their shift for purposes of performing a pass-down, other guards did not. Indeed, while one guard reported before his schedule as a matter of his own practice and preference, Motion ¶ 75-76, another did so at least in part to change into his uniform. Motion ¶ 18.[3] In addition, those who reported to work before their shift to perform the pass–down said that this process took various amounts of time, but often no more than 5-15 minutes. Motion ¶¶ 18 (10-15 minutes), 35 (10 minutes), 54 (5 minutes). Finally, just as many guards said that they called into the call-in/call-out system when they went on duty at their scheduled worktime. Motion ¶¶ 42, 66, 90.

Compensable work time does not include activities that are preliminary to the position's principal activities that occur before the scheduled work time. 29 U.S.C. §254 (a). While the FLSA does not define "preliminary" activities, the Supreme Court stated that "activities performed either before or after the regular work shift ... are compensable under the portal-to-portal provisions of the FLSA if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed...." *Steiner v. Mitchell*, 350 U.S. 247, 335 (1956). An activity is integrally related to an employee's principal activity when "the activity is performed regularly by the employees within the course of the employer's business."

---

[2]Macklin testified that although "lots" of guards did not report 15 minutes before their shift to perform a pass down, he was unaware of any guard being disciplined for that. Motion ¶¶ 76-77. It bears noting as well that although Flowers claims that Mike Kiswani told him to report 15 minutes before his shift to perform a pass down, he was never disciplined for that, but did receive many warnings for failing to report to work at his scheduled time. Motion ¶53, Exhibit B, Bates labeled Ingram 2383-2386, 2389-2390, 2392, 2394, 2396, 2398, 2400.

[3]One guard said that if time permitted, he would perform a 5-minute walk-down of the building upon reporting to the site. Motion ¶ 101.

*Nichols v. City of Chicago*, 789 F. Supp. 1438, 1442 (N.D. Ill. 1992) *citing Dunlop v. City Elect., Inc.*, 527 F. 2d 394, 401 (5th Cir. 1976).

An activity is preliminary if it is "undertaken for the employees' own convenience, not being required by the employer and not being necessary for the performance of their duties for the employer." *Dunlop*, 527 F. 2d at 398; see *Leone v. Mobil Oil Corp.*, 523 F. 2d 1153 (D.C. Cir. 1975) (employee's voluntary accompanying OSHA inspectors on factory inspections not compensable); *Hodgson v. Katz & Bestoff*, 365 F. Supp. 1193 (W.D. La. 1973) (counting cash balance before shift not required by employer is not compensable). The record does not support that the Company has a policy requiring guards to report to their shift for purposes of engaging in pass-down activities, or that it was necessary for the guards to do so in order to perform their duties. Indeed, many guards testified that they did not even perform a pass down before their shift, but simply reported for duty using the call-in/call-out system and relieved the guard who was manning the site. Therefore, the pass-down activity that some guards performed was preliminary and not compensable work time.

Further, even if the pass-down process is not a preliminary activity, it is, at best, *de minimus* and not compensable. Under the FLSA, "employees cannot recover for otherwise compensable time if it is *de minimus*." *Lindow v. United States,* 738 F. 2d 1057, 1062 (9th Cir. 1984). Four factors have been used to determine whether an activity is *de minimus*. The first and "important factor in determining whether a claim is *de minimus* is the amount of time spent on the additional work." *Gonzalez v. Farmington Foods. Inc.*, 296 F. Supp. 2d 912, 928 (N.D. Ill. 2003) *citing Lindow*, 738 F. 2d at 1062. The second factor is "the practical administrative difficulty of recording the additional time." *Id. citing Lindow*, 738 F. 2d at 1063. The third factor

11

is the "aggregate amount of compensable time." *Id*. Finally, the fourth factor is "whether the claimants performed the work on a regular basis." *Id*. at 929.

The record establishes guards who performed a pre-shift pass-down spent no more than five to fifteen minutes doing so. "Most courts have found daily periods of approximately 10 minutes *de minimus* and not compensable." *Lindow*, 738 F. 2d at 1062 (seven to eight minutes of daily pre-shift work is *de minimus* under the FLSA); *Frank v. Wilson & Co.*, 172 F.2d 712 (7th Cir. 1949) (five minutes of preliminary pre-work each day *de minimus*). For these reasons, the time guards spent to perform a pass down is *de minimus* and is not compensable, or at best, requires an individualized review to determine whether the pre-shift time worked by each opt-in Plaintiff is *de minimus*.

Pre-shift time is not suitable for class treatment for the reasons cited. The individualized inquiry that would be necessary to first discern what guards reported to work before their shift to perform a pass-down, and of those guards, how often they did so, and then of those occasions how often they spent more than a *de minimus* amount of time performing the pass-down activity defeats the practicality of class treatment.[4] See *Carlson v. U.S.*, 521 F. 3d 1371, 1376-1377 (Fed. Cir. 2008)(post-order requirement for prison guards to exchange information and equipment between incoming guards coming on shift and outgoing guards going off shift taking no more than ten minutes each day was *de minimus* and not compensable).

---

[4]Some guards who said they reported 15 minutes early to perform pass down did not report for duty by calling into the Company system until right before their shift started. Motion ¶¶53, 75, 101. An employer is not liable for pre-shift work performed by an employee that it did not require, and did not know had been performed. *Kellar v. Summit Seating Inc.*, 664 F. 3d 169, 171-178 (7th Cir. 2011). Thus, determining whether the particular guard reporting before their shift notified WSB of having done so would also require individualized treatment.

**Post-shift Work**

Opt-in plaintiffs contend that they were not paid for work performed past their scheduled shift. The number of times a guard testified to staying past their shift, because of tardy relief fluctuated from a hand-full of occasions to almost all the time. Motion ¶¶ 34 (4 to 5 times a week), 42 (70% of the time), 67 (5 to 6 times), 79 (3 to 4 times), 102 (routine basis), 114 (80% of the time). Further, whether guards were paid for the time they worked past their shift is not clear, as several guards did not state that they were seeking pay for time they reported working past their shift. For example, Brown said his claim was for meal breaks not taken and meetings he attended. Motion ¶ 26. Sextion claims he is seeking pay for breaks he did not get, and for a couple of days early in his employment for which he was not paid. Motion ¶ 48. King-Booker said that other than the meetings she attended, she is not claiming pay for any other work performed off-the-clock. Motion ¶ 98. Moreover, the Company employed a process that a guard could use to report a failure to be paid for the time worked past their shift, which the guards used sometimes to their satisfaction and sometimes not. Motion ¶¶ 15, 24, 36, 62, 68, 97, 104, 123.[5] This process included permitting them to listen to their own call-in/call-out recordings. Motion ¶¶ 15, 62.

Only an individualized inquiry could fairly evaluate which guards, if any, would be owed monies for working past their shift. That inquiry would include whether the guard stayed on duty past his/her shift waiting for his/her relief, how long he/she stayed beyond his/her shift, and whether he/she was paid for doing so. In addition, guards who testified to regularly working past

---

[5] Most plaintiffs testified that if they worked past their shift, they used the call-in/call-off system only once they actually went off duty, even if that did not occur until some time after their scheduled shift ended. Motion ¶¶ 33, 42, 67, 102, 113.

13

their shift did so, because their relief was late. Motion ¶¶ 33-4, 42, 102, 114. Yet, this assertion that guards were chronically late is wholly inconsistent with their claim that guards regularly reported before their shift to perform a pass-down. Such divergent and inconsistent claims requires an individualized analysis to this claim.

Finally, the guards who claim they regularly worked past their scheduled work time, because their replacement had not yet arrived to the site to relieve them does not apply for those guards assigned as rovers. For, guards assigned as rovers did not need to stay on duty until relieved, but were free to call off duty at the end of their shift. Motion, ¶ 56. As the record establishes that guards were appointed as rovers at times and assigned as guards to a dedicated building at other times, an individualized inquiry as to the position held by the guard for the period of the worktime claimed would also be necessary. For the reasons stated, post-shift time claimed by the opt-in Plaintiffs is not suitable for class treatment.

### Fairness and Procedural Considerations

Fairness and procedural considerations dictate that decertification of the collective action is appropriate. In evaluating these considerations, courts look to the purpose of §216(b) actions under the FLSA: "(1) reducing the burden on plaintiffs through the pooling of resources, and (2) efficiently resolving common issues of law and fact that arise from the same illegal conduct." *Morgan v. Family Dollar Stores, Inc.*, 551 F. 3d 1233, 1264 (11th Cir. 2008). Further, a court "must also determine whether it can coherently manage the class in a manner that will not prejudice any party." *Reed*, 266 F.R.D. at 462 [inside quotations omitted]. A "collective action is designed to permit the presentation of evidence regarding certain representative plaintiffs that will serve as evidence for the class as whole." *Id*. at 463 *quoting Bayles v. Am. Medical Response*

14

*of Colo., Inc.,* 950 F. Supp. 1053, 1065 (D. Colo. 1996). "It is oxymoronic to use such a devise in a case where proof regarding each individual Plaintiff is required to show liability." *Id*. Where the claimed violations are driven by facts and circumstances specific to each opt-in plaintiff requiring individual adjudication, any benefit of "pooling Plaintiffs' resources is outweighed by the need for individual mini-trails." *Cruz v. Lawson Software, Inc.*, 704 F. Supp. 2d 1050, 1063 (D. Minn. 2011). Here the individualized adjudication required to determine liability for the claims asserted, as shown above, martial against class treatment.

      WHEREFORE, Defendants request that the Court decertify the conditional certification of the Plaintiff's collective action.

<br>

                                                       Respectfully Submitted,

                                                       /s/Mark Hansen
                                                 Mark Hansen, Attorney for
                                                 Defendants, World Security Bureau, Inc.,
                                                 and Dena Halloway

Mark Hansen
Anthony S. Graefe
Graefe & Hansen, Ltd.
55 West Monroe, Suite 3550
Chicago, IL 60603
(312) 236-0177